IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 1, 2010

## IN THE MATTER OF: AMBER M. S. AND STEFANIE L. S.

**Appeal from the Juvenile Court for Wilson County**
**No. 8758, 8766      Barry Tatum, Judge**

**No. M2010-00873-COA-R3-PT - Filed November 30, 2010**

Mother appeals the termination of her parental rights to her two oldest children. The children were first removed in 1998. Mother briefly regained custody in 2001 only to have the children removed again when Mother's aunt successfully petitioned for custody. Mother moved to Arizona in 2001 and has had very little contact with the children since that time. When the aunt became unable to care for the children, they were placed in the custody of DCS and have resided with foster families ever since. DCS filed a petition to terminate the parental rights of both parents and Father voluntarily surrendered his parental rights on March 9, 2009. Following a trial in February 2010, the trial court granted DCS's petition on the grounds of abandonment by willful failure to visit, abandonment by willful failure to support, and substantial noncompliance with the permanency plans, and upon the finding that termination was in the best interests of the children. We affirm the termination of Mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Andrea Hagan, Lebanon, Tennessee, for the appellant, Mariah M. S.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; and Joshua Davis Baker, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

### OPINION

Mariah S. ("Mother") and Timothy S. ("Father") are the parents of three minor children: Amber M.S., born August 5, 1992, Stefanie L.S., born June 4, 1995, and J.S., born

November 7, 1996. These proceedings only pertain to the two oldest children, Amber and Stefanie (collectively, "the children"). Father and Mother married when Mother was sixteen years old; they divorced following the birth of J.S. in 1996. Father voluntarily surrendered his parental rights pertaining to Amber and Stefanie on March 9, 2009 and is not a party to this appeal.

All three children were first removed from Mother's custody and adjudged dependent and neglected on March 18, 1998 after the Department of Children's Services ("DCS") visited Mother's home and discovered dog feces all over the girls' bedroom and that the children's basic daily needs were not being met. All three children were placed in the legal custody of DCS and in physical custody of April and Richard M., Mother's Aunt and Uncle. Mother was allowed visitation, and ordered to pay child support to Aunt and Uncle and comply with the plans of care developed by DCS. The children remained with Aunt and Uncle for approximately three years at which time they were returned to Mother's custody; however, Mother's custody was short-lived.

Not long after Mother regained custody, Mother's Aunt discovered that Mother was failing to take the girls to school or DCS-ordered counseling; she also observed that the girls were often dirty and not eating properly. As a consequence, Mother's Aunt and Uncle filed a petition seeking custody of all three girls on June 21, 2001. They were granted temporary legal and physical custody on September 18, 2001.

Soon thereafter, Mother moved to Arizona with her boyfriend. Mother returned to visit the children in Tennessee a few times after moving to Arizona. She stayed with Aunt, Uncle, and the children during these infrequent visits. When the oldest child, Amber, was in the second grade, Mother visited for approximately one month, but left abruptly and unexpectedly. On another visit, Mother took all the children shopping on the day before Amber's birthday, and bought the children fishing poles with the announced intention of taking the three children fishing the following morning for Amber's birthday. Mother, however, left that night without warning to return to Arizona. Thereafter, Mother did not call to talk with the children, she did not send cards or letters, and she never visited the children again. Moreover, she did not pay any child support and she did not provide contact information for her Aunt and Uncle to reach her.

The children continued to live with Mother's Aunt and Uncle for the next several years. In 2005, Uncle passed away, and Aunt was left to care for the children alone. Father occasionally made small support payments but his small and sporadic payments were not adequate to provide for the children. After Uncle's death, Aunt worked a full time job to provide for the children, which impaired Aunt's ability to provide proper supervision for Amber and Stefanie. Soon thereafter, the girls developed severe behavioral problems. The

situation continued to worsen and, on January 10, 2008, Aunt filed petitions seeking alternative placement for Amber and Stefanie. The petitions were granted and the girls were again placed in the legal custody of DCS and in the physical custody of separate foster families. Lovita Greer was appointed DCS team leader to oversee the cases.

When DCS assumed legal custody this time, no one knew Mother's address or how to contact Mother. DCS caseworkers performed diligent searches to locate Mother, but were unable to establish contact with Mother for months, until June 2008, when Mother contacted her Aunt. Thus, in the interim, DCS independently developed long term, permanency plans for the children. Both plans initially had the primary goal of reunification with the parents and the secondary goal of "exit custody" with Aunt. The plans required Mother to: 1) gather the skills necessary to effectively parent the children in a safe and secure environment; 2) pay child support, 3) maintain stable income and housing for four consecutive months, 4) build a relationship with the children, 5) maintain contact with DCS, and 6) visit with the children at least four hours per month.

After Mother contacted her Aunt in June of 2008, Mother spoke with DCS caseworker Sara Gregory, the children's case worker, and provided Ms. Gregory with her Arizona address and contact information. Ms. Gregory promptly sent Mother copies of both permanency plans by certified mail on June 4, 2008. The receipt confirmation indicated that the package was delivered to Mother's address and signed for on June 9, 2008.

The plans were accompanied by explicit instructions from Ms. Gregory regarding what Mother needed to do to comply with the plans. She was first asked to sign the attached signature page, indicating that she had read and understood the plans, and return it to DCS. She was also instructed to complete the required assessments in a reasonable time period and provide proof to Ms. Gregory of her progress. She was given release forms with pre-addressed, postage-paid return envelopes so Ms. Gregory could contact the service providers and get proof of Mother's compliance. The package also included a document titled, "Criteria and Procedures for Termination of Parental Rights," which explained the criteria and procedures for termination of parental rights and warned Mother of the consequences if she failed to comply with the plans.

Over the course of the summer of 2008, Ms. Gregory contacted Mother several times. On June 19, she sent Mother another letter encouraging her to contact DCS for help completing the parental responsibilities, known as "action steps," in the permanency plans. The letter notified Mother of an upcoming team meeting regarding Amber. Ms. Gregory also called Mother and left her a message with contact information for Community Partnerships of Southern Arizona, an organization that could assist Mother with completing the action

steps. Mother then left a message for Ms. Gregory that she was in contact with Community Partnerships and working with them to get the help she needed.

On September 18, 2008, Ms. Gregory sent another letter to Mother to inform her that the goals of the permanency plans had changed, due to Mother's lack of progress and the length of time the children had already been in foster care. The primary goal changed from reunification to adoption, with the possibility of "exit custody with kin." The following parental responsibilities were also added: 1) provide proof to DCS of stable income, 2) schedule an alcohol and drug assessment, complete the assessment, and follow the assessor's recommendations, 3) schedule and complete a clinical intake and follow the recommendations, 4) have regular contact with DCS before contacting the children, 5) require any person living in her home to complete a criminal background check. The new plans were ratified by the trial court on December 15, 2008. Mother was notified of this hearing but did not appear.

DCS filed the first petition to terminate Mother's parental rights on April 9, 2009. By this time, Mother was represented by counsel. DCS then sent Mother and her attorney a household budget form, which would have allowed DCS to pay for Mother's transportation from Arizona to Tennessee, and a hotel room in Tennessee so that Mother could attend hearings and visit with the children. DCS sent the form multiple times, but it was never returned.

Mother then participated telephonically in a permanency review hearing on May 18, 2009. During that hearing, Mother stated that she had completed an alcohol and drug assessment and was enrolled in counseling; however, she could not produce any proof of her claims. At this point, Mother had not visited the children in more than four years. In its order following this hearing and setting the first date for the termination trial, the trial court stated that Mother, "has done nearly nothing to achieve reunification with her daughters . . . has not visited them in four years, only intermittently communicates with them, and has not produced any proof of even a minimal accomplishment under the [permanency] plan." Mother did not attend any subsequent team meetings or hearings held during the summer of 2009.

The first petition to terminate Mother's parental rights was dismissed for improper service of process. DCS filed a second petition on October 26, 2009, and Mother was properly served with the petition and a summons through certified mail. The return receipt indicates Mother signed for the petition on October 31, 2009. The second petition, which was substantially similar to the first, alleged that Mother had abandoned the children by failing to visit, support, and provide a suitable home, that Mother substantially failed to comply with the permanency plan, and that termination was in the best interests of the children.

By this time, Mother had participated in one team meeting with the DCS caseworkers, one Foster Care Review Board, and one court hearing; she participated in each of them by telephone conference. Nevertheless, Mother still did not maintain regular contact with DCS. On the few occasions that Mother communicated with DCS, she maintained that she was completing the action steps required of her in the permanency plans, she also maintained that she did not need DCS's help in that respect. However, Mother never produced any proof to support these claims and she never returned the consent to release information forms so that DCS could communicate with the agencies in Arizona.

A bench trial was held on February 10 and 11, 2010 in the Wilson County Juvenile Court. Mother's legal counsel appeared and participated on behalf of Mother at trial but Mother did not appear in person, she did not give a deposition, and she did not participate by telephone.[1] In its case-in-chief, DCS presented the following witnesses who testified in support of its petition: Cassandra Cooper, Stefanie's therapist who had been treating and monitoring her throughout her time in foster care; Mother's Aunt; Ms. Greer, the DCS team leader; Ms. Gregory, the DCS caseworker; and Judy B., Stefanie's foster mother. Amber and Stefanie also testified in support of the petition.[2] No other witnesses testified, nor was any other proof presented in Mother's case-in-chief. As a result, the evidence presented in DCS's case-in-chief was uncontested, with the exception of questions posed to the witnesses during cross-examination by Mother's counsel.

The trial court held that DCS had presented clear and convincing evidence to prove: 1) abandonment by failure to visit, because Mother had not visited the children in the four months preceding the filing of the termination petition; 2) abandonment by failure to support, because Mother had not paid child support since the summer of 2008; 3) failure to comply with the permanency plan, because Mother failed to complete any action steps or maintain regular contact with DCS; 4) that the permanency plans were reasonably related to remedying the reasons for foster care; 5) that DCS had made reasonable efforts to assist Mother in complying with the permanency plans; and 6) that termination was in the best interest of the children. As for the allegation that Mother abandoned the children by failing to provide a suitable home, the trial court held that DCS failed to meet its burden with regard to this ground because no inspection had been conducted on Mother's Arizona home. Having found several grounds upon which to terminate Mother's parental rights and that termination of her

---

[1]Mother does not dispute that she had notice that the trial was taking place and six separate attempts were made to contact Mother at various times of day during the trial, to no avail.

[2]At the time of trial, Stefanie was fifteen years old, and living with foster parents who indicated that they would be willing to eventually adopt her. Amber, who was seventeen, was not in a pre-adoptive home.

parental rights was in the children's best interests, the trial court terminated Mother's parental right to both children. This appeal followed.

On appeal, Mother contends that the trial court erred in terminating her parental rights because, she asserts, DCS failed to give her the required statutory notice before pursuing termination on the ground of abandonment. Alternatively, she argues that, even if the notice was sufficient, DCS failed to present clear and convincing evidence that she willfully abandoned the children. She also asserts that DCS failed to prove that she substantially failed to comply with the permanency plans by clear and convincing evidence, or that termination was in the best interest of the children.[3]

## STANDARD OF REVIEW

Parents have a fundamental right to the care, custody and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993). This right is superior to the claims of other persons and the government, yet it is not absolute. *In re S.L.A.*, 223 S.W.3d 295, 299 (Tenn. Ct. App. 2006).

Parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). The petitioner has the burden of proving that there exists a statutory ground for termination, such as abandonment or failing to remedy persistent conditions that led to the removal of the child. Tenn. Code Ann. § 36-1-113(c)(1); *Jones*, 92 S.W.3d at 838. Only one ground need be proved, so long as that ground is proved by clear and convincing evidence. *See In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003). In addition to proving one of the grounds for termination, the petitioner must prove that termination of parental rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2); *In re F.R.R.*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re A.W.*, 114 S.W.3d 541, 544 (Tenn. Ct. App. 2003); *In re C.W.W.*, 37 S.W.3d 467, 475-76 (Tenn. Ct. App. 2000) (holding a court may terminate a parent's parental rights if it finds by clear and convincing evidence that one of the statutory grounds for termination of parental rights has been established and that the termination of such rights is in the best interests of the child). Therefore, a court may terminate a person's parental rights if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is clearly and convincingly established that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810

_____

[3]On appeal, DCS does not pursue the ground of abandonment by failure to support, nor does it appeal the trial court's holding that it failed to prove abandonment by failure to provide a suitable home for the children.

(Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Whether a statutory ground has been proved by the requisite standard of evidence is a question of law to be reviewed *de novo* with no presumption of correctness. *In re B.T.*, No. M2007-01607-COA-R3-PT, 2008 WL 276012, at *2 (Tenn. Ct. App. Jan. 31, 2008) (no Tenn. R. App. P. 11 application filed) (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810).

**ANALYSIS**

I.
STATUTORY NOTICE

Mother contends DCS failed to give her proper notice as required by Tenn. Code Ann. § 37-2-403(a)(2)(B). The statute directs that in cases where the petitioner seeks termination on the grounds of abandonment, the parent must be informed of "the definition and potential consequences of 'abandonment' as that term is defined in Tenn. Code Ann. § 36-1-102,"[4] and that he or she may seek legal counsel. *In re J.L.E.*, No. M2004-02133-COA-R3-PT, 2005 WL 1541862, at *7 (Tenn. Ct. App. June 30, 2005). The purpose of the notice provisions is "to inform parents, before they engage in conduct constituting abandonment, of the potential consequences of that conduct." *Id.* at *9. Furthermore, the parent must be informed before the four month abandonment period has run. *Id.* ("Obviously, notifying Mother in February of 2004 that her failure to establish a suitable home by October of 2003 constituted grounds for termination in a petition that had already been filed does not meet the statutory requirement of notice.").

This information must be provided in the permanency plan. Tenn. Code Ann. § 37-2-403(a)(2)(A); *see In re J.L.E.*, 2005 WL 1541862, at *7. The court must also "explain on the record the law relating to abandonment" during the hearing in which the court considers the permanency plan. Tenn. Code Ann. § 37-2-403(a)(2)(B)(i); *see In re J.L.E.*, 2005 WL 1541862, at *7. However, if the parent does not sign the permanency plan or does not appear at the permanency plan hearing, DCS may still proceed with termination on the grounds of abandonment provided:

---

[4]Tenn. Code Ann. § 36-1-102(1)(A)(i) defines "abandonment" as: "for a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward support of the child."

(*a*) That the court record shows, or the petitioning party presents to the court a copy of the permanency plan or plan of care that shows that the defendant parents or legal guardians, subsequent to the court review in subdivision (a)(2)(B)(i), has signed the portion of the permanency plan or plan of care that describes the criteria for establishing abandonment under § 36-1-102, or that the court record shows that, at a subsequent hearing regarding the child, the court made statements to the parents or legal guardians required by subdivision (a)(2)(B)(i).

(*b*) By an affidavit, that the child's permanency plan or plan of care containing language which describes the criteria for establishing abandonment under § 36-1-102 was presented by the agency party to the parents or guardians at any time prior to filing the termination petition, or that there was an attempt at any time to present the plan which describes the criteria for establishing abandonment under § 36-1-102 to the parents or guardians at any time by the agency party, and that such attempt was refused by the parents or guardians.

(*c*) That, if the court record does not contain a signed copy of the permanency plan or plan of care, or if the petitioning agency cannot present evidence of a permanency plan or plan of care showing evidence of such notice having been given or an affidavit showing that the plan was given or that the plan was attempted to be given to the parents or guardians by the agency and was refused by the parents or guardians, and, in this circumstance, if there is no other court record of the explanation by the court of the consequences of abandonment and the right to seek an attorney at any time, then the petitioning agency shall file with the court an affidavit in the termination proceeding which describes in detail the party's diligent efforts to bring such notice required by subdivision (a)(2)(B)(i) to such parent or guardian at any time prior to filing the agency's filing of the termination petition.

Tenn. Code Ann. §37-2-403(a)(2)(B)(ii)(*a*)-(*c*).

In the instant case, DCS sent the permanency plans to Mother by certified mail with instructions that Mother sign and return the signature page. For Mother's convenience, DCS included postage-paid, pre-addressed return envelopes, and called Mother several times in an effort to help her. Despite its efforts, DCS was unable to get Mother to return the signature pages. However, it is undisputed that Mother received the plans: the delivery confirmation pages indicate that the original plans received by Mother in June 2008, and the revised plans, in which the goals changed from reunification with parents to adoption, were received by

Mother in November 2008. Included with the plans was a document titled, "Criteria and Procedures for Termination of Parental Rights." This document explicitly stated:

> Your parental rights may be terminated against your will if the judge of a chancery, circuit, or juvenile court finds by clear and convincing evidence that there is a legal basis for termination and that termination is in the best interest of your child. . . . Tennessee law currently lists the following as grounds for termination of parental rights:
>
> Abandonment. A parent has willfully failed to visit, [or] to engage in more than 'token' visitation . . . for four (4) consecutive months immediately before the termination petition is filed.

The record also reflects that Mother participated in a permanency review hearing on May 18, 2009, during which she was accompanied by counsel. In its order following that hearing, court stated:

> The Court heard evidence, and finds, that Ms. Gregory has been unable to gain the mother's attention or to get her involved in the services and responsibilities set out in all of the permanency plans . . . By her own sworn admission today, she has not seen her children in four years, and statements of the parties indicate that communication via mail and phone has been sketchy.
>
> The plan drawn up and presented to the Court this date contains responsibilities for the mother as have all of the others. Today, the Court gave warnings to [Mother] that because of her lack of cooperation, the termination will go forward on July 29, 2009 except for good cause that it should be continued. Adoption and exit custody to be with relatives are the only approved goals, and it continues to be in the best interest of the children to remain foster care with those goals in mind.[5]

We find this statement, given more than five months prior to the commencement of the petition to terminate, fulfills the statutory notice requirements in T.C.A. § 37-2-403(a)(2)(B)(ii)(*a*): "that the court record shows that, at a subsequent hearing regarding the child, the court made statements to the parents or legal guardians required by subdivision (a)(2)(B)(i)." First, by this time Mother had been appointed legal counsel. Second, the court's

---

[5]This hearing occurred during the pendency of the first petition to terminate Mother's rights, which was dismissed due to insufficient service of process and DCS re-filed the petition, alleging the same grounds, on October 26, 2009.

statements show that the court informed Mother that her continued absence from her children's lives could ultimately result in the termination of her parental rights. This is especially true when the court's statements are coupled with the warnings contained in the Criteria and Procedures for Termination of Parental Rights and the undisputed fact that Mother did receive that document along with the permanency plans. *Cf. State Dep't of Children's Servs. v. K.W.C.*, No. E2007-00307-COA-R3-PT, 2007 WL 2198593, at *10 (Tenn. Ct. App. Aug. 1, 2007) (Termination on ground of abandonment was error where DCS admitted it did not send Mother documentation explaining the law relating to abandonment prior to filing the petition to terminate her rights); *In re B.L.C.*, No. M2007-01011–COA-R3-PT, 2007 WL 4322068, at *5 (Tenn. Ct. App. Dec. 6, 2007) (Where record showed that Father received permanency plan explaining the law on abandonment, but Mother did not because DCS had "failed miserably" in its efforts to locate Mother, termination of Mother's rights on ground of abandonment was in error); *In re J.L.E.*, 2005 WL 1541862, at *7 (Termination on abandonment grounds was error where parent did not receive notice of the definition of abandonment and the criteria and procedures for termination of parental rights until after the petition to terminate had been filed); *In re D.D.K.*, No. M2003-01016-COA-R3-PT, 2003 WL 23093929, at *6 (Tenn. Ct. App. Dec. 30, 2003) (Termination on abandonment grounds was error where there was no testimony that DCS made any attempt to present permanency plan to Father for his signature).

We therefore affirm the trial court's holding that DCS afforded Mother the statutory notice required in cases concerning termination on the grounds of abandonment.

We must now determine whether there is clear and convincing evidence to establish one or more grounds for termination. *See In re Adoption of A.M.H.*, 215 S.W.3d at 810 (proof of one ground is sufficient under Tenn. Code Ann. § 36-1-113(c)). We will first consider whether Mother abandoned the children by willfully failing to visit. Tenn. Code Ann. § 36-1-113(g)(1).

II.

ABANDONMENT

Abandonment may be found upon a showing by clear and convincing evidence that, "for a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) have either willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(A)(i). Failure to visit a child is "willful" when a person "is aware of his or her duty to visit, has the capacity to do so, makes no attempt to do so, and has no

justifiable excuse for not doing so." *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005) (citing *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004)). "Where the failure to visit is not willful, however, a failure to visit a child for four months does not constitute abandonment." *In re Adoption of A.M.H.*, 215 S.W.3d at 810. "[A] parent who attempted to visit and maintain relations with his child, but was thwarted by the acts of others and circumstances beyond his control, did not willfully abandon his child." *Id.*

The undisputed testimony at trial from Aunt showed that, at the time DCS filed the petition to terminate Mother's rights on October 26, 2009, Mother had not visited the children in approximately four years; thus greatly exceeding the four-month time period required by the statute. Tenn. Code Ann. § 36-1-102(1)(A)(i).

The record also reflects that Mother's failure to visit was willful. First, it is clear from the record and Ms. Gregory's testimony that Mother was aware of her duty to visit the children. Ms. Gregory sent Mother numerous letters as well as the permanency plans, all of which stated that Mother needed to visit the children. Second, with the help offered by DCS, Mother had the capacity to visit the children. Mother did visit the children a few times after Aunt and Uncle were granted custody in 2001. Most pertinent to this issue, however, is the fact that DCS made multiple offers to pay for Mother's transportation and hotel to visit the children and attend the hearings and team meetings concerning these children, if Mother would have completed and returned the household budget form. Conversely, there is no evidence in the record to explain why Mother could not visit her children during the requisite time.

The revised permanency plans required Mother to establish regular contact with DCS as well as maintain a stable income and complete several assessments relating to parenting skills before visiting or contacting the children. Essentially, the permanency plans required Mother to complete these tasks as the first step toward regular visitation and communication. With regard to these preliminary steps, DCS had "an affirmative duty" to assist Mother. *See In re R.L.F.*, 278 S.W.3d 305, 313 (Tenn. Ct. App. 2008). DCS is required to "do more than simply provide parents with a list of service providers and then leave the parents to obtain the services on their own." *In re Tiffany B.*, 228 S.W.3d148, 159 (Tenn. Ct. App. 2007).

In this case, DCS has done so. After an extensive search, Ms. Gregory sent Mother contact information for the Community Partnerships of Southern Arizona, where Mother could obtain the help she needed. Ms. Gregory followed up with numerous phone calls and letters, attempting to establish regular communication with Mother, keeping Mother informed about her children, and asking if she needed help setting up meetings with the Community Partnerships or with transportation. She offered to stay late at the DCS office to make up for the two-hour time difference between Tennessee and Arizona so that Mother

could call when she got off work. Mother declined all of Ms. Gregory's offers, saying she was able to, and in fact was, completing the tasks on her own. When asked for proof, Mother indicated that she sent some documentation to her attorney. When DCS failed to receive proof, Ms. Gregory sent Mother release forms so that they could contact the service providers directly. However, Mother did not return the forms.

Last, Mother offered no evidence at trial that she tried to make the effort to visit with her children but was prevented from doing so by the acts of others or circumstances beyond her control. *See In re Adoption of A.M.H.*, 215 S.W.3d at 793. The uncontroverted testimony at trial shows that she made no effort at all.

Based on the foregoing analysis, we affirm the trial court's holding that DCS presented clear and convincing evidence of abandonment by failure to visit.

III.
FAILURE TO COMPLY WITH PERMANENCY PLANS

Although DCS need only prove one ground for termination, *In re Adoption of A.M.H.*, 215 S.W.3d at 810, we also find that the record supports the trial court's holding that Mother substantially failed to comply with the children's permanency plans. *See* Tenn. Code Ann. § 36-1-113(g)(2). The original plans required Mother to: 1) gather the skills necessary to effectively parent the children in a safe and secure environment; 2) pay child support; 3) maintain stable income and housing for four consecutive months; 4) build a relationship with the children; 5) maintain contact with DCS; and 6) visit with the children at least four hours per month. The revised plans added the following, more specific requirements: 1) provide proof to DCS of stable income; 2) schedule an alcohol and drug assessment, complete the assessment, and follow the assessor's recommendations; 3) schedule and complete a clinical intake and follow the recommendations; 4) have regular contact with DCS before contacting the children; and 5) require any person living in her home to complete a criminal background check.

These requirements were reasonable, and addressed the issues with Mother's parenting; namely that she was frequently absent from the children's lives for long periods of time, and would appear sporadically and unpredictably. The assessments would also have allowed DCS to further pinpoint which areas Mother needed the most help, and address the underlying causes of her unreliability. The requirements were aimed at helping Mother gather the tools she needed to maintain a safe and stable lifestyle, so that she could play a positive and supportive role in the children's lives. *See In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004).

-12-

Mother failed to comply with the plans in any way. She did not maintain stable housing or income, as illustrated by the fact that DCS had to go to great lengths to locate her after she moved. She failed to pay child support, except for approximately $100 in 2008. She also did not complete the parenting or drug and alcohol assessments, attend counseling, or establish regular contact with DCS. She did not provide the names of the other people residing in her household so that criminal background checks could be performed. In short, she failed to take any steps to visit or build a relationship with her children. We have already sufficiently addressed DCS's efforts in helping Mother comply with the plans; Mother failed to reciprocate.

## IV.
### THE CHILDREN'S BEST INTERESTS

We must now turn to the issue of whether DCS proved by clear and convincing evidence that termination of Mother's parental rights was in the best interests of the children. Tenn. Code Ann. §36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 810; *In re Valentine*, 79 S.W.3d at 546.

The factors to be considered in making this determination include, but are not limited to those stated in Tenn. Code Ann. § 36-1-113(i). We have determined that DCS has established three of the factors listed in the statute by clear and convincing evidence. First, as previously discussed, Mother has not "maintained regular visitation or other contact with the child[ren]." Tenn. Code Ann. § 36-1-113(i)(3).

Second, a "meaningful relationship" has not "otherwise been established between the parent or guardian and the child[ren]." Tenn. Code Ann. § 36-1-113(i)(4). Mother communicated with the children very infrequently and sporadically after she moved to Arizona in 2001. Both children testified that they wanted Mother's parental rights to be terminated. Amber stated, "she hasn't been with us for a long time, and I don't think she's ever going to." Stefanie stated, "she's never been there for me, and she's never tried to do anything for us, and I just want to move on with my life and be done with her." Stefanie's therapist expressed "grave concerns" about Mother's apparent lack of interest in a relationship with Stefanie. Aunt, the children's caretaker before they entered DCS custody, testified that Mother "really hurt" the children, and that after Mother's last visit when she left without warning, Amber "just never was the same."

Third, we find that "the effect a change of caretakers and physical environment is likely to have" a negative impact on Stefanie's emotional and physical condition. Tenn. Code Ann. § 36-1-113(i)(5). Her behavior and grades have improved since she has been living with her foster family, and they have expressed a willingness to adopt her. With regard to Amber,

although she is not in a pre-adoptive home, Ms. Gregory testified that Amber would eventually be placed in such a permanent home if Mother's rights were terminated. Ms. Gregory also testified that a permanent family is in the best interests of both children.

Considering these factors, we affirm the finding of the trial court that termination of Mother's parental rights is in the children's best interests.

## CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against The Department of Children's Services due to Mother's indigency.

_____
FRANK G. CLEMENT, JR., JUDGE